

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

MARY E. CORBIN,

      Plaintiff,

v.                                              Civil Action No. 3:08cv173

OFFICER EVERETTE B. WOOLUMS, *et al.*,

      Defendants.

## MEMORANDUM OPINION

Before the Court is Defendants' Motion for Summary Judgment. (Docket No. 28.)
Plaintiff Mary E. Corbin has filed an Amended Memorandum of Points and Authorities in
Opposition to Defendants' Motion for Summary Judgment (Docket No. 65), and Defendants
have replied (Docket No. 66). The Court held a hearing on November 21, 2008. Accordingly,
the matter is ripe for adjudication.

### I. Background

Ms. Corbin is an African-American woman. On December 1, 2006, she was involved in
a minor automobile incident in the parking lot of a Wal-Mart store in the Town of
Tappahannock, Virginia ("the Town"). The owner of the other vehicle, Randall Singhas, called
the police to come to the scene and facilitate the exchange of insurance information.

Officer Everette B. Woolums is a Caucasian man employed as a police officer with the
Tappahannock Police Department ("the Department"). Officer Woolums responded to the call
and arrived at the scene of the accident. Ms. Corbin alleges that Officer Woolums knocked her
cellular phone out of her hand, seized her, and handcuffed her left hand.

On March 18, 2008, Ms. Corbin filed the instant suit against Officer Woolums, the Town, the Department, and Chief of Police James H. Barrett, Jr. Ms. Corbin raises four claims in her Complaint:

Claim One:     Assault, Battery and Gross Negligence Against Officer Woolums

Claim Two:     Section 1983 Violation Against Officer Woolums

Claim Three:   Section 1983 Violation Against the Town and the Department

Claim Four:    Section 1983 Violation Against Chief Barrett

Defendants moved to dismiss Claims Three and Four. (Docket No. 5.) This Court dismissed the aspects of Claim Three as to Ms. Corbin's claim against the Department in a Memorandum Opinion and Order entered on May 20, 2008. (Docket Nos. 16, 17.) All other claims remain pending.

Ms. Corbin predicates Claim One on the common law of Virginia, alleging that in the course of handcuffing her, Woolums intentionally caused offensive contact without justification. (Compl. ¶¶ 23, 24.) Claim Two rests on a theory that Woolums's actions were motivated by racial animus, constituting intentional discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment,[1] and that Woolums used excessive force in handcuffing her, in violation of the Fourth[2] and Fourteenth Amendments. (Compl. ¶¶ 31-34.) Claim Three asserts

---

[1]"No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

[2]"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

that the Town violated Ms. Corbin's Fourth and Fourteenth Amendment rights by engaging in a

pattern and practice of inadequately investigating the backgrounds of applicants to the

Department and inadequately training its police officers, so as to demonstrate a deliberate

indifference to the constitutional rights of African-Americans in the Town. (Compl. ¶¶ 36-42.)

Claim Four alleges that Chief Barrett had actual or constructive knowledge that Woolums had

displayed racial animus in the past, but failed to adequately supervise or discipline him, resulting

in an unreasonable risk of constitutional injury to the African-American citizens of

Tappahannock. (Compl. ¶¶ 44-47.) Defendants have raised the defense of qualified immunity as

to Officer Woolums and Chief Barrett, and assert that no constitutional violation occurred.

## II.  Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when

the Court, viewing the record as a whole and in the light most favorable to the nonmoving party,

determines that there exists no genuine issue of material fact and that the moving party is entitled

to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Once a party has properly filed

evidence supporting the motion for summary judgment, the nonmoving party may not rest upon

mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine

issues for trial. *Celotex,* 477 U.S. at 322-24.  These facts must be presented in the form of

exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most

favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.  In a qualified immunity case, this

usually means adopting the plaintiff's version of the facts to the extent they are not blatantly

contradicted by the record. *Scott v. Harris*, 550 U.S. 372, __, 127 S. Ct. 1769, 1775-76 (2007).

Whether an inference is reasonable must be considered in conjunction with competing inferences

to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995).

Nonetheless, the nonmoving party is entitled to have "'the credibility of his evidence as forecast

assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (*quoting*

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).  However, the nonmoving

party may not rest upon mere allegations or denials, *Anderson*, 477 U.S. at 248, and ultimately,

the court must adhere to the affirmative obligation to bar factually unsupportable claims from

proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing*

*Celotex*, 477 U.S. at 323-24).

### III.  Undisputed Facts

Ms. Corbin and her two teenage children were shopping at a Wal-Mart store in

Tappahannock, Virginia, on the evening of December 1, 2006.  As they were getting into their

vehicle to leave the store, Ms. Corbin's son, who is autistic, accidentally opened his car door into

the adjacent vehicle, denting its left rear quarter-panel.  The owners of the vehicle, Mr. and

Mrs. Singhas, were in or around the car at the time.  Mr. Singhas walked around to the Corbins'

car and asked Ms. Corbin's son if he was going to pay for the damage.  Ms. Corbin describes

Mr. Singhas as irate, and yelling at her son.  Ms. Corbin explained to Mr. Singhas that her son

was disabled and didn't talk.  (Corbin Dep. 13:23-24.)  The parties examined the damage to the

Singhases' car, and Mr. Singhas asked Ms. Corbin for her license and insurance information.

Ms. Corbin testified at her deposition that she did not comply with his request, because "I'd

4

rather for an officer or someone be there to witness, because I told him if he knew how much it was, how much it would cost, I could go ahead and settle it then." (Corbin Dep. 14:16-25.)

Ms. Corbin testified that she knew that she had proof of insurance in her vehicle, and that it would have been either in the arm rest between the two front seats, or in the glove compartment. (Corbin Dep. 26:8-13.) She also knew that she had her driver's license with her somewhere, although her deposition testimony is inconsistent as to the location of her driver's license and pocketbook during her interaction with Mr. Singhas and eventually Officer Woolums.[3] (Corbin Dep. 15:8-13 – pocketbook on shoulder, presumably with license inside; Corbin Dep. 22:17-23 – license had been dropped in vehicle; Corbin Dep. 26:2-7 – pocketbook was on driver's seat of car, with license inside.) Ms. Corbin called her husband to inform him about the damage, and asked him to come to the scene. (Corbin Dep. 19:1-3.)

Mr. Singhas asked Ms. Corbin more than once to produce her license and insurance information.[4] After she refused to comply with his requests, Mr. Singhas told Ms. Corbin he would be calling the police. (Corbin Dep. 19:15-22.) He then did so, reporting to the dispatcher that his vehicle had been damaged by another vehicle, the driver of which refused to provide her driver's license and insurance information. (Randall Singhas Decl. ¶ 3.) Officer Woolums arrived at the scene a short while later. Ms. Corbin, her daughter Catrice Campbell, and

---

[3] A genuine issue of material fact is not created where the only issue of fact is to determine which of the conflicting versions of the plaintiff's testimony is correct. *See Vantage Mktg., Inc. v. De Amertek Corp., Inc.*, 31 F. App'x 109, 114 (4th Cir. 2002) (No. 01-1366), *available at* 2002 WL 396778, at *3.

[4] All facts must be considered in the light most favorable to Ms. Corbin. Ms. Corbin's deposition testimony indicates that she couldn't remember how many times Mr. Singhas asked her for the information. (Corbin Dep. 15:1-3.) Mr. Singhas indicates he asked "at least three times." (Randall Singhas Decl. ¶ 3.)

Mrs. Singhas were standing outside their respective cars while Mr. Singhas went over to where Officer Woolums had parked. (Corbin Dep. 20:1-11.) Mr. Singhas and Officer Woolums approached the scene of the incident. Ms. Corbin testified that the following exchange then occurred between her and Officer Woolums:

> He asked – well – he told me, asked well, why didn't I give him a driver's license and insurance. He – and I said I would be glad to give it to him, get everything settled tonight, just my husband – he is just finding a place to park, he be over here in a couple of – I assume a couple of minutes, and then we will get – he will look at it, and if he think it is worth going through insurance, then we will do it. (Corbin Dep. 20:23- 21:6.)

The Singhases and Ms. Campbell all concur that Officer Woolums asked Ms. Corbin for her license and insurance information at least three times. (Campbell Dep. 10:2-3; Randall Singhas Decl. ¶ 4; Mary Anne Singhas Decl. ¶ 4.) Officer Woolums tried to show Ms. Corbin the Department's exchange-of-information form, explaining to her that he needed her information so that he could fill out the form, that she would receive a copy of it, and that no one would be getting a ticket or citation. (Incident Rep. 1; Corbin Dep. 45:7-25.) Ms. Corbin did not produce the requested information.

A few minutes after Officer Woolums came to the scene, Ms. Corbin had another telephone conversation with her husband.[5] Ms. Corbin testified that Officer Woolums was talking to her when the phone rang (Corbin Dep. 27:23-25), and that he told her to put the phone down, which she did not do (Corbin Dep. 28:11-15). When she answered the phone anyway and

---

[5] Ms. Corbin testified at her deposition that her husband initiated the second call. (Corbin Dep. 19:9-14, 27:17-22.) This is consistent with the incident report written by Officer Woolums, which indicates that Ms. Corbin's phone rang after he had asked her for the information three times, and he instructed her not to answer. (Incident Rep. 1.) The Singhases' written recollections of the incident, recorded shortly after these events occurred, also indicate that Mr. Corbin initiated the second call.

began speaking, Officer Woolums handcuffed her left hand,[6] and the phone dropped, or was

knocked,[7] to the ground. (Incident Rep. 1; Corbin Dep. 27:7-9 ("When [Woolums] twisted my

arm behind me, I was . . . talking on the phone, and it dropped out of my hand. . . .").)

Ms. Corbin remained handcuffed for a short time, perhaps several minutes,[8] until her husband

arrived and assured Officer Woolums he would provide his wife's information. (Incident Rep.

1.)

Once Mr. Corbin arrived, he and his wife located the relevant documents and provided

them to Officer Woolums so that Woolums could complete the exchange-of-information form.

(Corbin Dep. 25:23-26:17.) Ms. Corbin claims that Officer Woolums never asked Mr. Singhas

for his driver's license or insurance information until after she had produced hers, but the record

shows that it was unnecessary for Woolums to ask Mr. Singhas for that information because

---

[6] *See* Corbin Dep. 21:23-24 (Q: "Which arm did he handcuff?" A: "The left.").

[7] The phone remains operable, though chipped, and Ms. Corbin is not making any claim as to monetary damage to the cell phone. (Corbin Dep. 31:21-23.) Relying on testimony from Mr. Corbin and Ms. Campbell, Plaintiff's Amended Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment indicates that Woolums "knocked" the phone from Ms. Corbin's hand. (Pl.'s Am. Mem. of P. & A. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 2.) The Court notes that Plaintiff's Memorandum characterizes this interaction in much broader terms than the testimony of Ms. Corbin supports.

[8] *See* Corbin Dep. 29:25-30:9 (Q: "How long were you handcuffed?" A: "I don't even know, by the time my husband parked his truck and walked over there. . . . " Q: "Some number of minutes?" A: "I couldn't – I assume it was." Q: "It wasn't more than fifteen minutes, was it?" A: "I don't believe it was."). Mr. Singhas recalls that Ms. Corbin was handcuffed for a few minutes, between the time Ms. Corbin's phone rang and when her husband arrived at the scene and indicated that the information would be produced. (Randall Singhas Decl. Att. A.) Despite Ms. Corbin's uncertainty about the length of time the handcuff remained in place, the undisputed facts show that a few minutes passed, as Robert Corbin was already in the Wal-Mart parking lot when the second phone call between the Corbins transpired (Robert Corbin Dep. 3:16-17), and the cuff was removed shortly after Robert Corbin arrived at the scene.

Mr. Singhas already had made his information available. (Corbin Dep. 26:23-25; Incident Rep.

1.) Mr. Corbin wrote a check to Mr. Singhas in the amount of $1000 to cover the damage.

(Corbin Dep. 25:4-8.) Mr. Singhas later sent the Corbins a copy of a repair bill in the amount of

$195.50, along with a check for $804.50. (Robert Corbin Dep. 26:10-20.)

Ms. Corbin testified that she was not physically injured as a result of her encounter with

Officer Woolums. (Corbin Dep. 30:20-22.) Her left wrist was swollen and bruised for "maybe a

week" after the incident. (Corbin Dep. 36:2-6.) She did not see a doctor about her wrist, but she

put ice on it. (Corbin Dep. 36:6-7.) She suffers anxiety relating to the incident, particularly

when her son opens a car door or when she sees a Town police officer. (Corbin Dep. 30:12-19.)

Ms. Corbin believes that Officer Woolums's actions were motivated by racial animus.

Specifically, she believes this "because he didn't talk in the same manner to the Singhases that he

talked to" Ms. Corbin. (Corbin Dep. 29:5-10.) She perceived that Officer Woolums was "nice"

to the Singhases and "willing to help [the Singhases] more" than her. (Corbin Dep. 29:11-13.)

In contrast, Officer Woolums spoke to Ms. Corbin in a rough, loud manner. (Corbin Dep. 29:14-

17.)

## IV. Discussion

### A.    Claims Against Officer Woolums

Ms. Corbin brings several claims against Officer Woolums arising out of the incident.

She alleges violations of 42 U.S.C. § 1983 as to her Fourth and Fourteenth Amendment rights to

be free from unreasonable seizure and excessive force, and as to her Fourteenth Amendment

right to equal protection under the law.

8

42 U.S.C. § 1983[9] provides a private right of action for deprivation of constitutional rights by persons acting under the color of law.

> Section 1983 . . . "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred" . . . . Hence, to establish liability under Section 1983, a plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury.

*Brown v. Mitchell*, 308 F. Supp. 2d 682, 692 (E.D. Va. 2004) (citations omitted).

Ms. Corbin also asserts state-law claims of assault and battery, and gross negligence against Officer Woolums. Officer Woolums asserts the affirmative defenses of qualified immunity as to the Section 1983 claims and legal justification as to the state law tort claims.

### 1. **Qualified Immunity Standard**

The doctrine of qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity shields government officials performing discretionary functions from liability for civil damages, insofar as their conduct does not violate clearly established rights of which a reasonable person would have known, in order to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S.

---

[9] Section 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

800, 818 (1982). It is an immunity from suit rather than a mere defense to liability. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Whether a police officer is entitled to qualified immunity requires a two-part analysis. First, a court must ask whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. If no constitutional violation has occurred, the analysis ends there, and summary judgment should enter. If a constitutional injury has been established taking the view of the facts most favorable to the party alleging it, then the injured party must show that the right was clearly established, such that it would be clear to a reasonable officer that his or her conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001).

### 2. Unreasonable Seizure Claim

The parties agree that Officer Woolums "seized" Ms. Corbin within the meaning of the Fourth Amendment. (Pl.'s Opp'n 22; Defs.' Mem. in Supp. of Mot. for Summ. J. 19.) Therefore, in order to assert a valid claim that Officer Woolums violated her Fourth Amendment rights, Ms. Corbin must prove that her seizure was unreasonable.[10]

Defendants argue that no unlawful seizure occurred because Officer Woolums had probable cause to believe that Ms. Corbin had violated a Virginia criminal statute in his presence. (Defs.' Mem. in Supp. of Mot. for Summ. J. 18.) Plaintiff responds by claiming that Ms. Corbin

---

[10] Ms. Corbin was not arrested, and a Fourth Amendment seizure falling short of a traditional arrest is subject to a requirement of reasonableness. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968).

committed no offense. (Pl.'s Opp'n 22.) The parties' dispute, legal rather than factual in nature, revolves around the interpretation of the Virginia statute cited by Defendants.

Probable cause to effect a custodial arrest can rest on trustworthy facts and information available to an officer, such that a prudent person would believe a law had been violated. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). This is guided by two factors: "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992). Probable cause to arrest can exist even when the law believed to have been violated is a minor infraction. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").[11] Virginia law permits a police officer to "arrest, without a warrant, any person who commits any crime in the presence of the officer." Va. Code § 19.2-81.

Ms. Corbin does not deny her failure to produce her driver's license and proof of insurance to either Mr. Singhas or Officer Woolums despite their repeated requests. Instead, she characterizes her refusal to produce these documents as "moving slowly," either because she couldn't find the documents quickly or because she wished to wait for her husband to arrive to

---

[11] In *Atwater*, the Court also noted that the arresting officer was "not required, but authorized" to make a custodial arrest, without determining whether or not an arrest was in some sense necessary. 532 U.S. at 354. This indicates that, for Fourth Amendment purposes, it does not matter that Officer Woolums did not actually arrest Ms. Corbin but instead briefly detained her. *See also Figg v. Schroeder*, 312 F.3d 625, 636-37 (4th Cir. 2002) (adopting "minor offense doctrine" based on *Atwater* and rejecting Fourth Amendment claims of unreasonable seizure where plaintiffs were detained for several hours on driving under the influence and obstruction of justice grounds, but not arrested).

look for them.[12]  Even if this Court accepts the characterization, it is not material to the statute

that Defendants allege Ms. Corbin violated.  Section 46.2-894 of the Code of Virginia[13] clearly

requires that a driver involved in an accident causing damage to another vehicle "immediately"

stop and produce such information to the other driver or a police officer.  Regardless of whether

Ms. Corbin willfully refused to produce the documents because she awaited her husband's

arrival, or was simply upset and moving very slowly, the undisputed fact remains that Officer

Woolums asked her at least three times to produce them, and she did not produce them

"forthwith."  Therefore, Officer Woolums had probable cause to arrest Ms. Corbin for violating

the statute when she failed to comply with his multiple requests.  *See Brown v. Gilmore*, 278

F.3d 362, 368 (4th Cir. 2002) (finding officer was objectively justified in his belief that plaintiff

heard his request that she move her car, despite her claims that she did not hear him, and

therefore arrest based on probable cause was lawful).

---

[12] "Ms. Corbin did not *refuse* to produce her license and insurance information.  Rather, Ms. Corbin was unable to produce these items quickly enough to satisfy Officer Woolums." (Pl.'s Opp'n 21.)  The undisputed facts demonstrate that Officer Woolums asked Ms. Corbin to provide the documents three times, and Ms. Corbin's own deposition testimony clearly indicates that she disregarded the request.  (Corbin Dep. 21:7-12) (Q: "So you didn't give Officer Woolums your license and insurance information because you wanted to wait until your husband arrived?"  A: "Yes.  He told me – he did ask for my driver's license . . . and I was looking for it.").

[13] Section 46.2-894 of the Code of Virginia states:

The driver of any vehicle involved in an accident in which . . . an attended vehicle . . . is damaged shall immediately stop as close to the scene of the accident as possible without obstructing traffic . . . and report his name, address, driver's license number, and vehicle registration number forthwith to the State Police or local law-enforcement agency, to . . . the driver or some other occupant of the vehicle collided with or to the custodian of other damaged property. . . . Any person convicted of a violation of this section is guilty of . . . (ii) a Class 1 misdemeanor if the accident results in damage of $1000 or less to property.

12

Ms. Corbin relies on the argument that she was not a "driver" within the meaning of Va. Code § 46.2-894, and therefore Officer Woolums lacked probable cause to arrest or detain her. (Pl.'s Opp'n 21.) This argument is unavailing under the qualified immunity standard. Virginia Code § 46.2-894 patently imposes an obligation on the owner or operator of a vehicle that causes damage to another person or property to disclose pertinent personal information. Moreover, under the second prong of the qualified immunity analysis, it would not have been clear to Officer Woolums that he was violating a "clearly established" right or that his conduct was unlawful in the situation he confronted. *See Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002). Ms. Corbin has not cited any authority supporting her argument that she cannot be considered a "driver" because she "was *outside* of her vehicle at the time her son dented the adjacent vehicle" and neither car was running. (Pl.'s Opp'n 21.) Thus, Officer Woolums would still prevail on qualified immunity even if Ms. Corbin's unsubstantiated legal argument that she was not a "driver" were given merit, because a reasonable officer responding to a traffic accident objectively could have believed that Va. Code § 46.2-894 would be applicable to Ms. Corbin's failure to provide her license and registration number when asked.[14] For these reasons, the Court will GRANT summary judgment on the unreasonable seizure claim against Officer Woolums based on qualified immunity.

---

[14]The law contains no provision allowing an adult person to await arrival of a family member before providing legitimately sought information to an officer. Ms. Corbin's conduct also might have constituted obstruction of justice under Va. Code § 18.2-460. Courts regularly hold that an officer may seek identifying information without violating constitutional rights. *INS v. Delgado*, 466 U.S. 210 (1984); *see also Durney v. Doss*, 106 F. App'x 166, 169 (4th Cir. 2004) (No. 03-1975), *available at* 2004 WL 1681277, at *2 (allowing an officer, as a function of the police officer's "community caretaker" powers, to seek information from a toolbox in an unattended truck that had hit another vehicle in a parking lot).

### 3. **Excessive Force Claim**

A court must evaluate the amount of force used during a seizure for reasonableness. A court should look to the facts and circumstances of the particular case before it, including the severity of the crime forming the basis for probable cause to arrest; whether the arrestee poses an immediate threat of harm to others; and whether the arrestee is actively resisting arrest or attempting to flee. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). A court must assess the reasonableness of an officer's belief as to the appropriate level of force deferentially from that of the officer's on-scene perspective. *Id.* Ms. Corbin correctly points out in her response to Defendants' motion for summary judgment that she posed neither physical threat nor risk of flight. (Pl.'s Opp'n 6.) However, the inquiry does not end there, because "*Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts." *Saucier*, 533 U.S. at 205.

Where an officer's decision to arrest is objectively reasonable (i.e., based on probable cause), "'handcuffing the arrestee does not constitute unreasonable force.'" *Cooper v. City of Virginia Beach*, 817 F. Supp. 1310, 1315 (E.D. Va. 1993) (citation omitted) (collecting tight-handcuff cases). Courts consistently have rejected tight-handcuff excessive force claims at the summary judgment stage where the claimant neither alleges nor offers proof of any lasting or serious injury resulting from the use of handcuffs.[15] *See Brown*, 278 F.3d at 369 (finding no excessive force where officer handcuffed plaintiff, "causing her wrists to swell," and dragged her

---

[15] The rationale for rejecting excessive force claims predicated on very minor injuries was explained by the Fourth Circuit in the Eighth Amendment context in *Norman v. Taylor*, 25 F.3d 1259 (4th Cir. 1994) (en banc): a *de minimis* injury is conclusive evidence that only *de minimis* force was used, and so no genuine issue of material fact can exist as to whether a constitutional violation occurred.

into a police cruiser); *Carter v. Morris*, 164 F.3d 215, 219 n.3 (4th Cir. 1999) ("Carter's basis for her excessive force claim–that her handcuffs were too tight and that an officer pushed her legs as she got into the police car–is so insubstantial that it cannot as a matter of law support her claim under either the Fourth Amendment . . . or the Fourteenth."); *Cooper*, 817 F. Supp. at 1319 (no excessive force where handcuffs caused hands to go numb, but plaintiff "neither alleged nor offered proof of any lasting or serious injury flowing from the use of handcuffs"). Indeed, the right to make an arrest or investigatory stop "'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Saucier*, 533 U.S. at 208 (*quoting Graham*, 490 U.S. at 396).

In effectuating the detention, Officer Woolums handcuffed one of Ms. Corbin's hands. She remained handcuffed for several minutes, and, even by her account, suffered only temporary swelling and bruising – hardly a significant injury. The amount of force used clearly was not unreasonable, and therefore Officer Woolums is entitled to qualified immunity from Ms. Corbin's section 1983 claim based on excessive force. No violation of a statutory or constitutional right occurred. The Court will GRANT summary judgment on the excessive force claim based on qualified immunity.

### 4. Equal Protection Claim

Ms. Corbin asserts that Officer Woolums violated her Fourteenth Amendment right to equal protection because Officer Woolums's conduct toward her was tinged by racial animus.

In order to establish an Equal Protection claim, a plaintiff "must first demonstrate that he [or she] has been treated differently from others with whom he [or she] is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison*

*v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Disparity in treatment based on race, alienage, or national origin is permissible under the Equal Protection clause only if it is narrowly tailored to serve a compelling state interest. *Id.* (*citing City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). A race-neutral classification, on the other hand, is presumed valid and will be upheld if it is rationally related to a legitimate state interest. *Id.* The Constitution "only forbids arbitrary differentiations among groups of persons who are similar in all aspects relevant to attaining the legitimate objectives of legislation." *Van der Linde Housing, Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007) (*citing F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).

Ms. Corbin bases her Equal Protection claim on her perception that Officer Woolums was "nice" to Mr. and Mrs. Singhas but "loud" and "rough" with her, and, implicitly, on the fact that Officer Woolums asked her repeatedly for her license but apparently did not do the same to Mr. Singhas. For the reasons stated below, the Court finds that no race-based classification occurred during the interaction between Ms. Corbin and Officer Woolums, and therefore Officer Woolums's conduct is subject to rational basis review.

Officer Woolums responded to a call without knowing the parties involved. The undisputed record shows that the Singhases acted cooperatively toward Officer Woolums, but Ms. Corbin did not. In this regard, Ms. Corbin and the Singhases are not similarly situated. Officer Woolums sought only basic information from Ms. Corbin, and did so explaining that he did not seek to establish fault on her part (or that of Mr. Singhas). The Singhases made the information available; Ms. Corbin did not. Officer Woolums handcuffed Ms. Corbin because she did not produce her driver's license, in what he deemed to be a violation of Va. Code § 46.2-

894, not because of her race. The Fourth Amendment not only permits such an act, as discussed above, but such an act is also rationally related to a legitimate state purpose: enforcing the laws of the Commonwealth of Virginia. The purpose of Va. Code § 46.2-894 is "to facilitate accident investigation and to preserve public order." *Johnson v. Commonwealth*, 418 S.E.2d 729, 731 (Va. App. 1992). Officer Woolums's actions with regard to Ms. Corbin–arriving at the scene of the incident in response to Mr. Singhas's call, asking her for her license, and handcuffing her when she failed to do so after several minutes–were rationally related to that purpose. Treating Mr. Singhas differently than Ms. Corbin in this situation did not violate Ms. Corbin's Equal Protection rights because Mr. Singhas did nothing to frustrate the objectives of Va. Code § 46.2-894, while Ms. Corbin did.

Finally, Ms. Corbin cannot prevail on her Equal Protection claim based on her allegation that Officer Woolums used a rude, loud tone of voice with her and spoke nicely to the Singhases, because that does not constitute a cognizable constitutional injury. *Cf. Carter*, 164 F.3d at 219 n.3 ("[A]lthough Carter alleges that individual officers insulted her with racial epithets, such undeniably deplorable and unprofessional behavior does not by itself rise to the level of a constitutional violation.") Even viewing the interaction in the light most favorable to her, Ms. Corbin's testimony is bereft of any independent indicia of racial animus. Officer Woolums's conduct instead coincides with behavior toward a cooperative citizen and a non-cooperative citizen. Thus, Ms. Corbin cannot establish that a violation of her Fourteenth Amendment Equal Protection rights occurred, and Officer Woolums is entitled to qualified immunity. The Court will GRANT summary judgment on Plaintiff's Equal Protection claim based on qualified immunity.

### 5. State Tort Law Claims

Ms. Corbin asserts claims of assault, battery, and gross negligence against Woolums. The assault and battery claims stem from Officer Woolums's handcuffing her left wrist and knocking her phone to the ground. (Compl. ¶¶ 22-24.) In order for a plaintiff to prevail on state law claims of assault and battery, she must prove both a "wrongful act" and resultant physical injury. *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994) (*citing Pike v. Eubank*, 90 S.E.2d 821, 827 (Va. 1956)).

Because Officer Woolums's handcuffing of Ms. Corbin was legally justified, she cannot show that a "wrongful act" occurred, even if a *de minimis* injury occurred. *See id.* Therefore, the Court will GRANT summary judgment on the assault and battery claims.

Ms. Corbin's gross negligence claim also lacks merit. Ms. Corbin failed to produce evidence that Officer Woolums "demonstrated indifference and . . . utter disregard of prudence that amounted to a complete neglect of Ms. Corbin's safety, the safety of her property, and her rights under state and federal law." (Compl. ¶ 27.) As stated above, the undisputed facts indicate that Officer Woolums acted reasonably in response to her conduct. Summary judgment on the gross negligence claim shall be GRANTED.

### B.    Claim Against the Town

Ms. Corbin has also sued the Town under 42 U.S.C. § 1983, alleging that the Town "developed and maintained policies, customs and/or practices exhibiting deliberate indifference to the constitutional rights of persons in Tappahannock, thereby causing the violations of Ms. Corbin's constitutional rights." (Pl.'s Opp'n 9-10.) Specifically, she alleges that the Town failed to adequately investigate the backgrounds of applicants for employment with the Department,

18

adequately investigate citizen complaints of misconduct of the Department's police officers, and adequately train, supervise, discipline and control its police officers.

Where a plaintiff brings a Section 1983 claim against a municipality, liability attaches only if "an official policy or custom" caused the "unconstitutional deprivation of the plaintiff's rights." *Brown*, 308 F. Supp. 2d at 692 (*citing Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). An official policy or custom "need not derive from municipal ordinances." *Kirby v. Elizabeth City, N.C.*, 380 F.3d 777, 787 (4th Cir. 2004), *aff'd on reh'g*, 388 F.3d 440 (4th Cir. 2004). Rather, "it may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy." *Id.* (*quoting Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987)). Municipal liability may be imposed for even a single decision by municipal policymakers under appropriate circumstances. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

In the context of an allegation of inadequate police training, municipal liability for violations of Section 1983 exists only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," *and* the plaintiff can prove that the deficiency in training actually caused the police officers' indifference to her constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388, 391 (1989). Evidence of "a wide range of unrelated incidents on the part of the police department" will not establish the existence of a city policy or custom of unconstitutional behavior. *Carter*, 164 F.3d at 216.

The Court has already found that no unconstitutional deprivation of Ms. Corbin's rights occurred during her encounter with Officer Woolums. Therefore, the Court shall GRANT

summary judgment on that basis. *See Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991).

**C.     Official Policy or Custom of the Town**

The heart of Plaintiff's case appears to rest on this municipal policy claim:  that Officer Woolums's hire by the Department itself demonstrates some sort of constitutional impropriety. Plaintiff claims that the Town has a custom or policy of inadequately investigating the backgrounds of applicants to the Department, of responding to citizen complaints, and of training and supervising police officers.  Even if the Court were to address the policy and custom argument, Plaintiff would not prevail.

Much of Plaintiff's presentation to this Court has emphasized that, while employed by the Richmond Police Department, Officer Woolums fatally shot an African-American man during a law enforcement interaction, and Chief Barrett knew of the incident before hiring Officer Woolums.  While the Court has allowed limited discovery to allow Plaintiff to make this into a deficient hiring policy case, she has not done so.  Given that the record plainly shows that Officer Woolums did not violate Ms. Corbin's constitutional rights, Officer Woolums's interaction with Ms. Corbin simply is not the venue to litigate whether the earlier, unrelated shooting was proper.

In addition, the undisputed record shows that Officer Woolums was not censured for the shooting event, and in fact was cleared of any wrongdoing following an investigation by the Richmond Police Department and FBI..  (Woolums Aff. ¶ 6.)  The anecdotal evidence Plaintiff

seeks to raise largely is inadmissible, and offers no legal or factual tie to the alleged misconduct here.[16]

Finally, the other claims put forth by Plaintiff to establish a pattern and practice of inadequate hiring, training, and supervising of officers are equally unavailing. In particular, Plaintiff offers no standards against which to measure the Town's evidence of its policies and customs in order to prove their inadequacy. For instance, Plaintiff points to Chief Barrett's admission that the hiring process for Officer Woolums took ten days as suggestive that the hiring process was flawed for hiring officers generally and could be equally probative of efficiency or carelessness. (Pl.'s Opp'n 10.) But Plaintiff does not explain how or why a ten-day hiring process creates a policy that is deliberately indifferent to citizens' constitutional rights. Similarly, Plaintiff alleges that Chief Barrett failed to check Woolums's criminal record prior to hiring him, but offers no citation to the record or other evidence that this is true. (Pl.'s Opp'n 16.) Plaintiff cites Chief Barrett's failure to check into Officer Woolums's background at a high enough level, despite a record that supervisors from Officer Woolums's previous position with the Richmond Police Department were contacted and gave favorable references. The failure to check beyond favorable references does not evince deliberate indifferent to citizens'

---

[16]Harrison Long's declaration relies on hearsay evidence of a community perception of racial profiling by Officer Woolums. It undermines a claim of deliberate indifference by the Town, because it discloses that Chief Barrett attended a meeting of the Essex County Branch of the NAACP to address concerns of racial profiling. Robert Campbell's declaration, again, alleges only *perceived* racial profiling by Officer Woolums. The declarations of Horace Evans and Jana Bagley both concern events that occurred while Officer Woolums was employed by the Richmond Police Department, and therefore lack probative value toward the Town's deliberate indifference to the constitutional rights of its African-American citizens. For instance, Ms. Bagley did not even report the incident she recounts in her declaration to any member of the Richmond Police Department, so neither Chief Barrett nor the Town could have been on notice of the type of injuries she alleges to have suffered.

constitutional rights. While the Court rests its decision on Ms. Corbin's failure to establish a constitutional deprivation, even considering this record as a whole likely does not establish deliberate indifference.

**D.** **Claim Against Chief Barrett**

Lastly, Ms. Corbin sufficiently has stated a claim against Chief Barrett in his individual and official capacities. "An individual-capacity suit seeks to impose personal liability on a government official for actions taken under color of state law, whereas an official-capacity suit 'generally represent[s] only another way of pleading an action against an entity of which an officer is an agent.'" *J.S. ex rel. Duck v. Isle of Wight County Sch. Bd.*, 368 F. Supp. 2d 522, 526-27 (E.D. Va. 2005) (*quoting Monell*, 436 U.S. at 690 n.55). Thus, "[a] § 1983 lawsuit brought against an individual in his official capacity is [] duplicative of a claim brought against the municipality." *Id.* at 527 (dismissing claims against school board members in their official capacities because the plaintiff sued the school board over the same incident).

Plaintiff relies on her argument concerning the liability of the Town as to her claim against Chief Barrett in his official capacity. (Pl.'s Opp'n 17 n.12.) Therefore, her claim against Chief Barrett in his official capacity fails for the same reason her claim against the Town fails. Summary judgment for Chief Barrett in his official capacity is GRANTED.

Regarding Ms. Corbin's claim against Chief Barrett in his individual capacity, in order to prove supervisory liability under Section 1983, Ms. Corbin must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an

22

'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Viewing the record in the light most favorable to her, Plaintiff fails to present any evidence that Chief Barrett had knowledge that Officer Woolums was engaged in conduct that posed a risk of constitutional injury to the Town's citizens. Rather, Plaintiff cites conjecture and allegations of "widespread perception" to counter Chief Barrett's assertions that, to the extent issues existed, he investigated Officer Woolums's background and determined that none of the complaints about him were founded.[17] Far from demonstrating deliberate indifference to the constitutional rights of African-American citizens of the Town, Chief Barrett met with the NAACP to address concerns of racial profiling in the Department. (Pl.'s Opp'n 19.) Most fundamentally, Chief Barrett cannot be held liable in his individual capacity because Ms. Corbin suffered no constitutional injury. Summary judgment in favor of Chief Barrett in his individual capacity shall be GRANTED.

## V.  Conclusion

Because the alleged genuine issues of material fact "either are not genuine issues or are not material facts," *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985), and it appears from the

---

[17] "According to the information available to me on December 1, 2006, Woolums had never been sued, let alone lost a law suit, and had never been found to have violated the constitutional rights of anyone." (Barrett Decl. ¶ 4.)

undisputed facts that Ms. Corbin suffered no constitutional injury, Defendants' Motion for

Summary Judgment shall be GRANTED as to all claims and all defendants.

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States Magistrate Judge

Date: November 25, 2008
Richmond, Virginia

24